NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0328n.06

Case Nos. 19-2456/20-1365

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ERNEST KIRK; CLAUDIA KIRK, | ) | **FILED** |
| | ) | Jul 12, 2021 |
| Plaintiffs-Appellees (19-2456), | ) | DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellants (20-1365), | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| CALHOUN COUNTY, MICHIGAN, a municipal | ) | COURT FOR THE WESTERN |
| corporation; CHRISTOPHER YOUNG, acting in | ) | DISTRICT OF MICHIGAN |
| his individual capacity, jointly and severally, | ) | |
| | ) | |
| Defendants-Appellees (20-1365), | ) | **O P I N I O N** |
| | ) | |
| SERGEANT BRANDY EDMONDS and | ) | |
| DEPUTY BRANDON SPARKS, acting in their | ) | |
| individual capacities, all jointly and severally, | ) | |
| | ) | |
| Defendants-Appellants (19-2456). | ) | |

**BEFORE: SUTTON, Chief Judge; McKEAGUE and DONALD, Circuit Judges.**

**McKEAGUE, Circuit Judge.** The parties in this consolidated qualified immunity appeal have remarkably different versions of the facts, but at this stage of the litigation we are concerned only with legal questions. Viewing the facts in the light most favorable to Plaintiffs Ernest and Claudia Kirk, unknown individuals entered their property without identifying themselves as law enforcement officers, brandished their firearms at both Ernest and Claudia, and arrested Ernest without probable cause. Neighbors who witnessed the incident corroborated the Kirks's accounts, but a Calhoun County deputy misrepresented the neighbors' statements in his police report. The neighbors filed a citizen complaint with Calhoun County, but it was not adequately investigated.

Ernest and Claudia brought, as relevant on appeal, claims against several Calhoun County deputies for (1) false arrest, (2) malicious prosecution, and (3) excessive force, and Ernest brought (4) a *Monell* claim against Calhoun County. The district court granted summary judgment to Defendant Deputy Young on the malicious prosecution claim and to Calhoun County on the *Monell* claim. The court found there were genuine issues of material fact remaining for the false arrest and malicious prosecution claims against Defendant Deputy Edmonds and for the excessive force claim against Defendant Deputy Sparks. Finding no error in the district court's decisions, we **AFFIRM**.

**I.**

On April 9, 2015, Calhoun County Sheriff's deputies Greg Gammons and Brandy Edmonds were dispatched to a home in Pennfield Township to investigate a report of a robbery of an open garage. After arresting the suspect, the deputies then began canvassing houses. Shortly after midnight, they arrived at Ernest and Dr. Claudia Kirks's house. When Ernest looked out his window, he saw an unidentified individual with a flashlight and a gun outside his home. Ernest then grabbed his cell phone and gun. He opened the side door to his house and was "immediately confronted with a gun and a flashlight and someone yelling at [him]." Ernest then shouted: "This is private property. Who are you?"

The person outside was Deputy Edmonds. Deputy Edmonds and Ernest have very different recollections of what transpired next. Ernest claims that he kept his gun at his side and pointed towards the ground during their entire encounter. Deputy Edmonds, on the other hand, claims that Ernest had his gun drawn and pointed at her during the encounter. Ernest couldn't tell the person was an officer, so he repeatedly asked her to identify herself. Ernest claims that Deputy Edmonds never identified herself, but admits that at some point she announced: "Calhoun County." Ernest

also claims that Deputy Edmonds kept yelling "[d]rop the gun. Come out of the house. Get on the ground."

Ernest then went back inside and called 9-1-1. The operator told Ernest that the people outside his house were officers and that he should come out of the house with his hands up. Ernest exited his house through the garage door without his gun and was met by several armed deputies, who Ernest claims had their guns pointed at him. Ernest closed the garage door and went back inside. Deputy Gammons, however, kept the garage door from closing.

Deputy Gammons then spoke with Ernest on the phone and advised him that they were investigating a series of robberies and believed someone had stolen property from his residence. Ernest agreed to come outside. Ernest looked around his garage and told the officers that he did not believe anything was missing.

Deputy Edmonds contacted Deputy Gammons and told him she wanted Ernest arrested for assaulting a police officer. While Ernest was being arrested, Claudia exited the house and entered the garage. The officers said they would search the house, and Ernest told them he did not consent. He also told Claudia not to consent. The deputies claim that Ernest and Claudia were speaking in German, and Claudia testified that it was possible she and Ernest were speaking in German because they speak German together most of the time. Claudia claims that Deputy Brandon Sparks then grabbed her by the arm, pointed his gun at her lower abdomen,[1] threatened to shoot her dogs, and said: "you are going to let me into the house to search the house, and if you are not going to do that, you are going to be in more trouble than he is." Deputy Sparks denies pointing his gun at

---

[1] Claudia testified said that Sparks never touched her, but simply pointed the gun at her "lower abdomen" from less than "three or four feet" away. But Ernest says in his deposition that Deputy Sparks grabbed Claudia by the forearm.

Claudia. Ernest told Claudia to go inside and retrieve his gun. Deputy Sparks accompanied her and secured Ernest's gun.

The Kirk's next-door neighbors, Tracey Allen and Catherine Lopez, witnessed part of the incident between Deputy Edmonds and Ernest. Their bedroom window was located approximately 20 feet from the confrontation. Allen heard two voices shouting: "put your gun down; no, you put your gun down." Allen testified that Ernest kept his gun pointed at the ground the entire time. She also did not hear Deputy Edmonds identify herself as a law enforcement officer. Lopez, who went outside, claims that an officer pointed a gun at her and told her to go back inside.

Prosecutors charged Ernest with assault with a dangerous weapon and resisting and obstructing a police officer.

After Ernest's arraignment, Deputy Christopher Young interviewed Allen and Lopez. Allen and Lopez stated that Ernest did not point his gun at anyone and that the deputies never identified themselves as law enforcement officers. Neither of these statements, however, were included in Deputy Young's report. Allen testified that while Deputy Young was interviewing them, he told Allen that the license plates on her car were expired and that he "would hate for [her] to be pulled over," which Allen took as a threat.

When Allen saw Deputy Young's report from their interview, she found it misleading because it omitted key statements. Coincidentally, Allen spoke with the Calhoun County Sheriff's wife at a softball game and told her about the misleading report. The next day, Deputy Aaron Wiersma called Allen and asked if she would fill out a Citizen's Complaint form because she disputed the contents of the report that Deputy Young wrote. Allen and Lopez filled out the complaint and wrote that Deputy Young's report did not reflect what they said, that Deputy Young

4

made coercive threats to them, and that an unknown officer pointed their gun at Lopez that night. Deputy Wiersma collected the complaint and new statements and wrote a new report.

Ernest's criminal case was dismissed without prejudice because the victim, Deputy Edmonds, failed to appear at the preliminary hearing. Edmonds testified that she did not appear at the hearing because she was never served with a subpoena. Allen, however, says that she and Lopez were at the courthouse to testify at the hearing and saw Deputy Edmonds there. Allen believes that Deputy Edmonds recognized her because they made eye contact and Deputy Edmonds "glared" at her.

Ernest and Claudia sued Calhoun County, Sheriff Saxton, Deputy Edmonds, Deputy Gammons, Deputy Sparks, Deputy Young, and Deputy Brent Lincoln. Ernest alleged a false arrest claim against Deputy Edmonds and a malicious prosecution claim against Deputies Edmonds and Young. Both Ernest and Claudia alleged claims of excessive force and unreasonable search against Deputy Sparks. Lastly, Ernest brought a *Monell* claim against Calhoun County for condoning and approving of unconstitutional conduct by its officers.

Calhoun County moved for summary judgment on the *Monell* claim against it and the individual defendants moved for summary judgment on the remaining claims. The district court granted Calhoun County's motion and granted in part and denied in part the individual defendants' motion. The district court found that there were genuine issues of material fact remaining for the false arrest and malicious prosecution claims against Deputy Edmonds and the excessive force claim against Deputy Sparks. The court granted summary judgment for the malicious prosecution claim against Deputy Young and the unreasonable search claim against Deputy Sparks.

Deputy Edmonds and Deputy Sparks appeal the denial of summary judgment on the false arrest, malicious prosecution, and excessive force claims. Ernest and Claudia appeal the grant of

summary judgment to Calhoun County on their *Monell* claim and Deputy Young on the malicious prosecution claim.

**II.**

**A.**

We review a district court's denial of summary judgment on qualified immunity grounds de novo. *Hopper v. Phil Plummer*, 887 F.3d 744, 751 (6th Cir. 2018). Qualified immunity shields federal and state officials from money damages unless a plaintiff can "offer sufficient evidence to create a 'genuine issue of fact'" regarding whether "(1) the defendant violated a constitutional right and (2) that right was clearly established." *Bunkley v. City of Detroit*, 902 F.3d 552, 559 (6th Cir. 2018) (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "[I]f the district court determines that the plaintiff's evidence," viewed in the light most favorable to the plaintiff, "would reasonably support a jury's finding that the defendant violated a clearly established right, the court must deny summary judgment." *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015).

Qualified immunity involves a "two-tiered inquiry." *Jones v. Clark County*, 959 F.3d 748, 766 (6th Cir. 2020) (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)). First, we ask whether, viewing the facts in the light most favorable to the plaintiff, the officer's conduct violated a constitutional right. *Id.* Then we ask whether that constitutional right is clearly established. *Novak v. City of Parma*, 932 F.3d 421, 426 (6th Cir. 2019). The Supreme Court does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate" in the particular circumstances before the officer. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

**1. False Arrest Claim Against Deputy Edmonds**

Ernest alleges that he was arrested without probable cause when Deputy Edmonds directed Deputy Gammons to arrest him for assaulting a police officer, in violation of Mich. Comp. Laws § 750.81d(1).[2]

First, we must determine whether Ernest has demonstrated a "genuine factual dispute regarding [Deputy Edmonds's] violation of [his] clearly established right to be free from false arrest under these circumstances." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 284 (6th Cir. 2020). To prevail on a claim of false arrest, a plaintiff must show that "the officers lacked probable cause to arrest him or her." *Hartman v. Thompson*, 931 F.3d 471, 483 (6th Cir. 2019). An officer has probable cause to arrest if, based on the information known to her, a reasonable officer would believe the arrestee had committed a crime. *See Courtright v. City of Battle Creek*, 839 F.3d 513, 521 (6th Cir. 2016). Typically, the existence of probable cause is a jury question, "unless there is only one reasonable determination possible." *Osberry v. Slusher*, 750 F. App'x 385, 392 (6th Cir. 2018) (quoting *Parsons v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008)).

Here, taking all factual inferences in favor of Ernest and viewing the information possessed by Deputy Edmonds at the time of the arrest, a reasonable jury could find that Deputy Edmonds lacked probable cause to arrest Ernest for assaulting a police officer under Michigan law. There is a genuine factual dispute about whether Ernest pointed his gun at Deputy Edmonds or kept it pointed at the ground. And Deputy Edmonds herself testified that she would not have arrested Ernest if he kept his gun pointed at the ground.

---

[2] Section 750.81(d) provides: "an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony."

There is also a genuine factual dispute about whether Ernest knew Deputy Edmonds was a police officer. Deputy Edmonds argues that it was reasonable for her to believe that Ernest knew she was a police officer because she identified herself as "Calhoun County," and because Ernest saw her weapon, it was reasonable for her to believe that he also saw her police uniform. But a reasonable jury could find that it was objectively unreasonable for Deputy Edmonds to believe Ernest knew she was a police officer. A jury could decide that yelling "Calhoun County" didn't identify Edmonds and that, given it was dark and Ernest had a flashlight in his eyes, he didn't see her uniform. The evidence, viewed in Ernest's favor, is *not* susceptible to only one reasonable determination—that Deputy Edmonds had probable cause to arrest Ernest. *See City of Pontiac*, 533 F.3d at 503.

If true, Deputy Edmonds's conduct also violated clearly established law. In April 2015, it was clearly established in our Circuit that "absent probable cause to believe that an offense had been committed, was being committed, or was about to be committed, officers may not arrest an individual." *Logsdon v. Hains*, 492 F.3d 334, 343 (6th Cir. 2007) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 313 (6th Cir. 2000)); *accord Barton v. Martin*, 949 F.3d 938, 951 (6th Cir. 2020) ("It is well settled that the Fourth and Fourteenth Amendments require probable cause to justify arresting an individual."). And in *Logsdon*, we held that this standard alone, absent any "sea change in this body of law since [the plaintiff's] arrest," was sufficient to overcome the defendant's qualified immunity defense. 492 F.3d at 343. There has been no sea change in this body of law since Ernest's arrest in April 2015. As a result, Deputy Edmonds is not entitled to qualified immunity on the false arrest claim.

### 2. Malicious Prosecution Claim Against Deputy Edmonds

Ernest argues that Deputy Edmonds "participated in or influenced the decision to prosecute him by relaying a false narrative, including through post-arrest reports that alleged Kirk pointed his gun at her and that he knew that she was a[] [law enforcement] officer."

There are four elements to a malicious prosecution claim, but only one is in dispute here: whether the state lacked probable cause for the prosecution. *See Jones*, 959 F.3d at 756 (quoting *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010)). We have already held that there is a genuine issue of material fact as to whether Deputy Edmonds violated Ernest's constitutional right to be free from false arrest by arresting him without probable cause. And if there was no probable cause to arrest Ernest for assaulting a police officer, then there was no probable cause to prosecute him for it either.

The right to be free from malicious prosecution has been clearly established in our Circuit for decades. *See Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999) (finding that because "the requirement of probable cause is one of the cornerstones of Fourth Amendment protection," a reasonable police officer would know that "fabricating probable cause . . . would violate a suspect's clearly established Fourth Amendment right"). However, "[a] police officer violates a suspect's clearly established right to freedom from malicious prosecution under the Fourth Amendment 'only when his deliberate or reckless falsehoods result in arrest and prosecution without probable cause.'" *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015) (quoting *Newman v. Township of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014)).

A reasonable jury could find that Deputy Edmonds's post-arrest incident reports contained knowing or reckless falsehoods. Drawing all inferences in favor of Ernest, Deputy Edmonds knew that Ernest never pointed his gun at her and that Ernest did not know she was a police officer. And

these falsified statements facilitated the continued prosecution of Ernest without probable cause. If a jury finds that Deputy Edmonds deliberately or recklessly made false statements in her report, she violated Ernest's clearly established right to be free from malicious prosecution.

### 3. Excessive Force Claim Against Deputy Sparks

Next, Claudia claims that Deputy Sparks used excessive force by pointing his gun at her. A claim of excessive force "is evaluated under the objective standard of 'whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Simmonds v. Genesee County*, 682 F.3d 438, 444 (6th Cir. 2012) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). While "the ultimate question is 'whether the totality of the circumstances justifies a particular sort of seizure,'" *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (quoting *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005)), relevant factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

The *Graham* factors cut both ways. On the one hand, Claudia was never suspected of a crime, was unarmed and did not pose an immediate threat to officer safety, and did not attempt to evade arrest. On the other hand, Claudia's husband was suspected of assaulting a police officer with a firearm—a serious crime. And the officers could have reasonably believed that Claudia possessed the gun Ernest used since the officers had not yet recovered the weapon. Lastly, while Claudia followed the officers' orders, Ernest was not entirely cooperative with them that night.

But given that the facts surrounding the encounter between Deputy Sparks and Claudia are highly contested, whether Deputy Sparks violated Claudia's clearly established right to be free

from excessive force must be determined by a jury. The parties dispute whether Deputy Sparks grabbed Claudia's arm, whether Deputy Sparks deliberately pointed his gun at Claudia or whether he merely turned towards Claudia with his gun already drawn, how long Deputy Sparks pointed his gun at Claudia, what exactly Deputy Sparks said to Claudia when he brandished his firearm, and whether Deputy Sparks kept his gun drawn while he accompanied Claudia into the house. In addition to these factual disputes, Deputy Sparks himself testified, after denying that he pointed his gun at Claudia, that "in that situation, no, I would not have had any reason to point a weapon at her."

We need not further delineate the parameters of when it is permissible for an officer to brandish a firearm at an unarmed citizen because of the several factual disputes that remain. Deputy Sparks denies ever drawing his gun and apparently did not even believe he had a reason to point the gun in the first place. In sum, the dispute of material facts bars resolution of the excessive force claim against Deputy Sparks on qualified immunity grounds.

**B.**

### 1. Malicious Prosecution Claim Against Deputy Young

Ernest claims that Deputy Young contributed to his continued unlawful prosecution by misrepresenting Allen's and Lopez's statements and thereby concealing the exculpatory evidence that Ernest never pointed his weapon at Deputy Edmonds and that she never identified herself as a law enforcement officer.

The disputed element here is whether Deputy Young "made, influenced, or participated in" the decision to prosecute Ernest.[3] The basis of Ernest's claim is that Deputy Young unlawfully

---

[3] A claim for malicious prosecution "is not limited to the institution of proceedings; it can also support a claim for 'continued detention without probable cause.'" *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017) (quoting *Sanders v. Jones*, 845 F.3d 721, 728 n.4 (6th Cir. 2017), *as amended on denial of reh'g* (Mar. 20, 2017), *cert. granted, judgment vacated on other grounds,* 138 S. Ct. 640 (2018)).

prolonged Ernest's prosecution by fabricating and withholding evidence (Allen's and Lopez's statements), "the absence of . . . which would have dissolved probable cause for [his] continued detention." *Gregory v. City of Louisville*, 444 F.3d 725, 747 (6th Cir. 2006).

The district court found that Deputy Young could not be held liable for the continued prosecution of Ernest because Ernest failed to "establish[] a genuine issue of material fact that had [Deputy] Young included the statements in his report[,] the prosecutor would have decided to drop the charges against Ernest." We agree. The record makes clear that the charges were dismissed because Deputy Edmonds failed to appear at the hearing. The prosecution had Allen's and Lopez's supplemental statements two weeks prior to the hearing and yet continued with the charges.

Ernest disagrees, arguing that the charges against him were dismissed because of Allen's and Lopez's supplemental statements, because when Deputy Edmonds learned that Allen and Lopez were present and planned to testify against her, she left the building in fear that they would "expose the absence of probable cause." But Ernest misses the point. The prosecution already had the supplemental statements from Allen and Lopez in their possession and declined to dismiss the charges against Ernest. Even if Deputy Edmonds left the courthouse because she feared that Allen and Lopez would refute her story, the prosecution did not drop the charges *because* of Allen's and Lopez's supplemental statements, but because Deputy Edmonds failed to appear.

### 2. *Monell* Claim Against Calhoun County

Ernest alleges that Calhoun County has a custom of not investigating allegations of unconstitutional behavior by its officers.

A plaintiff can bring a § 1983 claim against a municipality when "the [municipal] action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v.*

*Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Thus, municipalities cannot be held liable "under § 1983 on a *respondeat superior* theory—in other words, 'solely because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691). Instead, a plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged" and that there is "a direct causal link between the municipal action and the deprivation of federal rights." *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (quoting *Bryan Cnty. Bd. of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).

A plaintiff can prove that a municipality had such a policy or custom by showing that an official with final decision-making authority ratified illegal actions. *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019). Here, Ernest argues that Sheriff Saxton "ratified" what Ernest alleges was an inadequate investigation into the Allen/Lopez citizen complaint. This unwritten policy or custom of not investigating citizen complaints, Ernest argues, was the "moving force" behind the violation of Ernest's "constitutional right not to be maliciously prosecuted."

Ernest relies almost exclusively on our decades-old *Monell* jurisprudence for the proposition that a sheriff's failure to investigate one instance of allegedly unconstitutional conduct of its deputies can be considered a "ratification" of their conduct, thereby subjecting the municipality to *Monell* liability under § 1983. *See Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989);[4] *Marchese v. Lucas*, 758 F.2d 181, 188-89 (6th Cir. 1985). But, as we recently explained in *Pineda v. Hamilton County*, we have since restricted the scope of this ratification theory. 977 F.3d 483, 495 (6th Cir. 2020).

---

[4] Ernest misrepresents the holding in *Leach*. There, the Court found that the municipality had a policy of deliberate indifference to prisoners' medical needs based on the fact that there were fourteen separate, prior instances where the prison failed to investigate prisoner mistreatment. 891 F.2d at 1246-48.

To prove a "custom-of-tolerance" theory of liability, a plaintiff must show that "there was a pattern of inadequately investigating similar claims." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Without such evidence, "there is no demonstration of causation to show that the allegedly inadequate investigation caused the constitutional violation in question." *David v. City of Bellevue*, 706 F. App'x 847, 853 (6th Cir. 2017).

Importantly, "an entity's failure to investigate the plaintiff's specific claim will, by definition, come *after* the employee's action that caused the injury about which the plaintiff complains." *Pineda*, 977 F.3d at 495. And if there was no custom of tolerating inadequate investigations into illegal conduct, the wrongdoer could not have been motivated by a municipal policy in committing the constitutional violation. "A series of investigative failures before the plaintiff's injury, by contrast, might at least suggest that the local entity's custom led to the employee's harmful action in the plaintiff's own case." *Id.*

Ernest has not provided any evidence of prior inadequate investigations at Calhoun County that could establish the existence of a custom of tolerating unconstitutional conduct by its deputies. In addition to the complaint against Deputy Young for misrepresenting Allen's and Lopez's statements, Ernest points to two other complaints that it alleges Calhoun County failed to fully investigate: (1) Deputy Young's threatening comment to Allen about her expired license plate and (2) the unknown officer who pointed their weapon at Lopez during the April 9 encounter between Ernest and Deputy Edmonds. But these complaints are not examples of *earlier* inadequate investigations that could have prompted Deputy Young to act with impunity in concealing Allen's and Lopez's statements. They were additional complaints alleged in the same document as the misrepresentation complaint.

Ernest also fails to establish causation. Deputy Young's allegedly threatening behavior had no relation to the constitutional violation (here, malicious prosecution). In other words, Deputy Young's allegedly threatening comment towards Allen about her license plate and the unknown officer who allegedly pointed a gun at Lopez could not possibly serve as the "moving force" behind Ernest's prosecution. *See Alman*, 703 F.3d at 903.

Ernest next argues that he can make out a *Monell* claim based on the fact that Sheriff Saxton "ratified" Deputy Young's conduct by testifying that his handling of the Allen/Lopez complaint was "appropriate," citing to this Court's decision in *Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020). In *Wright*, a plaintiff who was severely beaten by two police officers brought a *Monell* claim against a city, alleging that the police department ratified the use of excessive force by its officers. *Id.* at 882. The plaintiff introduced evidence of inadequate training documents and testimony of a supervisor that "he had never heard of a use of force incident by a Euclid officer that seemed inappropriate to him." *Id.* at 882. The Court held a "reasonable jury could find that the City's custom" of permitting the use of force is "so settled so as to have the force of law" that it was the moving force behind the constitutional violation. *Id.* at 881.

But there is no such evidence here. Sheriff Saxton testified that at the time Allen and Lopez submitted their citizen complaint, there was an unwritten policy of "investigat[ing] any and all citizen complaints," and that if a citizen complains about threatening behavior from a deputy, that claim should be investigated. This is a far cry from the testimony of the officer in *Wright*. And Calhoun County did investigate the complaint that Deputy Young misrepresented Allen's and Lopez's statements. Sheriff Saxton sent Deputy Wiersma to re-interview Allen and Lopez and allowed them to write their own corrected statements.

Because Ernest failed to show a pattern of inadequate investigations that were tolerated by the Sheriff, Ernest cannot demonstrate that Deputy Young was motivated by a custom of tolerance to misrepresent Allen's and Young's statements in an effort to conceal evidence that would reveal that there was no probable cause to continue prosecuting Ernest. Accordingly, his *Monell* claim fails.

### III.

For the foregoing reasons we **AFFIRM** the denial of qualified immunity to Deputy Edmonds on the false arrest and malicious prosecution claims and to Deputy Sparks on the excessive force claim. We also **AFFIRM** the denial of summary judgment for the malicious prosecution claim against Deputy Young and the *Monell* claim against Calhoun County.