**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-3503
_____

RENA ABRAN,
Individually, and as mother and as administrator of the
estate of Gene Wilson, deceased,

Appellant

v.

CITY OF PHILADELPHIA;
BLANCHE CARNEY, Commissioner of Philadelphia Prison System/Philadelphia
Department of Prisons, Individually and in her Official Capacity; GERALD MAY,
Warden, Curran-Fromhold Correctional Facility, Philadelphia Prison System/
Philadelphia Department of Prisons, Individually and in his Official Capacity; NANCY
GIANNETTA, Warden Alternative and Special Detention Center A/D/B ASD,
Philadelphia Prison System/Philadelphia Department of Prisons, Individually and in her
Official Capacity; WILLIAM LAWTON, Warden, Philadelphia House of Corrections
Philadelphia Prison System/Philadelphia Department of Prisons, Individually and in his
Official Capacity; TROY FEARON, Correction Officer, Badge #5648, Philadelphia
House of Corrections, Philadelphia Prison System/Philadelphia Department of Prisons,
Individually and in his Official Capacity; JOHN/JANE DOES 1 THROUGH 13,
Individually and in their Official Capacities, Jointly, Severally, and/or in the alternative;
CLYDE FEARON, Correctional Officer, Badge #5648, Philadelphia House of
Corrections, Philadelphia Prison System/Philadelphia Department of Prisons,
Individually and in his Official Capacity; CATHY TALMADGE, (PR#180574) Deputy
Warden/Major, Philadelphia House of Corrections, Philadelphia Prison
System/Philadelphia Department of Prisons, Individually and in her Official Capacity;
MARILOU ORGASAN, Registered Nurse, Philadelphia House of Corrections,
Philadelphia Prison System/Philadelphia Department of Prisons, Individually and in her
Official Capacity; AISHA COOK, (PR#270552), Correctional Sergeant, Philadelphia
House of Corrections, Philadelphia Prison System/Philadelphia Department of Prisons,

Individually and in her Official Capacity; CORIZON HEALTHCARE; MHM
SERVICES INC; DR. OLUMIDE OLUWABUSI, MD, Individually and/or Employee of
MHM Services, Inc.

_____

On Appeal from the United States District Court for the
Eastern District of Pennsylvania
(District Court No. 2:18-cv-01107)
District Court Judge: Mitchell S. Goldberg

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
November 16, 2021

(Filed: November 18, 2021 )

Before:  AMBRO, JORDAN, and RENDELL, *Circuit Judges*.

_____

O P I N I O N[*]

_____

**RENDELL**, *Circuit Judge*

Plaintiff-Appellant Rena Abran, as administrator of decedent Gene Wilson's

estate, challenges the District Court's grant of Defendant-Appellees' motions for

summary judgment.  Abran, Wilson's mother, brought a civil rights action arising from

her son's suicide while incarcerated at the House of Corrections ("HOC"), a prison

operated by the Philadelphia Department of Prisons ("PDP").  Abran contends that PDP

supervisory, correctional, and medical personnel violated Wilson's Eighth Amendment

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

rights and are liable for damages under 42 U.S.C. § 1983. The District Court concluded that, while Wilson's suicide was a tragedy, his federal constitutional rights were not violated and there was no basis for any of Abran's supplemental state law claims. Abran also faults the District Court for granting summary judgment notwithstanding certain purportedly outstanding discovery requests—a complaint that is not supported by the record. We will affirm.

## I.

On March 21, 2016, Gene Wilson began serving a ten-day sentence at the Curran-Fromhold Correctional Facility, operated by the PDP. Upon his arrival, staff from PDP medical contactor Corizon Healthcare, Inc. ("Corizon") examined Wilson, who denied having any suicidal ideation or other mental health problems. On March 23, Corizon staff again examined Wilson, who reported that he had no history of suicide attempts. Wilson was then transferred to another PDP facility: the Alternative and Special Detention Center ("ASD").

On March 24, Wilson complained to ASD staff that he was concerned for his safety there, so much so that he felt nauseous. A Corizon nurse examined Wilson, noting that he was, *inter alia*, depressed, anxious, "[e]xpress[ed] . . . illogical ideas," and had "[p]hysical complaints that seem[ed] unreal." Appx. 914–15. The nurse recorded that Wilson was not experiencing suicidal ideation and had no history thereof. Wilson requested that he be placed in protective custody.

3

On March 25, Wilson reported vomiting and abdominal pain to ASD medical staff, who sent him to the emergency room, but he was quickly discharged once appendicitis was ruled out. After returning to ASD, Wilson had a follow-up appointment with a Corizon nurse, during which he repeated his request for protective custody. The nurse forwarded this request to PDP staff, causing Correctional Lieutenant Thakadiparambil Thomson to follow up with Wilson. Wilson told Thomson that other ASD inmates were "after him" and that it was somehow related to the robbery of a barbershop Wilson once owned. Appx. 3, 780. Specifically, Wilson reported that he was "going to get hurt or [] going to hurt somebody." Appx. 3, 780.

Thomson passed Wilson's concerns and request on to his supervisor, Deputy Warden Cathy Talmadge. Talmadge ordered that Wilson be screened for and placed in administrative segregation, knowing that he would have to be examined yet again by medical and behavioral health personnel and cleared by them for the transfer to be carried out. Talmadge gave this order to ensure that Wilson would be subject to increased supervision by prison staff and not be housed with the individuals he feared.

A Corizon nurse conducted the medical side of the subsequent evaluation and cleared Wilson for administrative segregation, as he told the nurse that he was not thinking about killing himself and he expressed no feelings of hopelessness (although he did express "bizarre thoughts or beliefs" and "appeared over-anxious, panicked, afraid, or angry"). Appx. 4. Psychiatrist Dr. Olumide Oluwabusi—employed by medical contractor MHM Services, Inc.—conducted a behavioral evaluation and concurred,

4

finding that Wilson was not at risk of self-harm after specifically questioning him about "wishes or plans to kill [himself]."[1] Appx. 370-71.

Wilson was then transferred to a cell in the administrative segregation housing unit at HOC, arriving around 11 p.m. on March 25. Corrections Officer Clyde Fearon conducted his rounds in Wilson's cell block the following morning at 5:59 a.m. and observed Wilson lying in his bunk.[2] Fearon checked Wilson's cell again at 6:30 a.m. and saw Wilson crouched over on the floor, tied around the neck by a bedsheet to the cell toilet's pushrod. Fearon immediately entered the cell, untied the sheet, checked to see if Wilson was breathing, and then started to perform CPR. Fearon testified that, as he performed chest compressions, he felt that Wilson's body was still warm. While providing Wilson emergency care, Fearon radioed for medical staff support and requested that his supervisor, Sergeant Aisha Cook, join him in trying to save Wilson. Sgt. Cook, Nurse Marilou Orgasan—an employee of Corizon—and at least two other officers arrived at Wilson's cell within three minutes of Fearon's radio call and attempted life-saving care. Nurse Orgasan testified that, while providing this care, she felt that Wilson was "cold to the touch." Appx. 6.

---

[1] The District Court separately dismissed all claims against Dr. Oluwabusi and MHM Services, Inc. on statute-of-limitations grounds. Although Abran named both MHM and Dr. Oluwabusi in her Notice of Appeal, she apparently does not contest that dismissal, as her brief sets forth no arguments challenging the District Court's order.

[2] Fearon knew from experience that inmates deemed suicidal by medical personnel would not be placed in administrative segregation. He thus believed that Wilson, having been sent to administrative segregation, was not suicidal.

Despite these medical efforts, Wilson was pronounced dead by 911 emergency responders when they arrived about ten minutes later. HOC Warden William Lawton or an assigned lieutenant may have held a meeting with involved PDP personnel to discuss Wilson's suicide later that morning.

On March 15, 2018, Abran brought this action asserting federal constitutional claims for deliberate indifference to Wilson's serious medical needs as well as various state law claims. During discovery, a dispute arose as to whether the City and Corizon had complied with Abran's requests to produce various records generated before and after Wilson's suicide, including those related to the possible meeting at HOC later that morning. Abran filed two motions to compel, both of which were denied by the District Court.[3]

The District Court granted summary judgment in favor of Defendants on all Counts. In its thorough and well-reasoned opinion, the Court reiterated its findings regarding the earlier discovery disputes. This appeal followed.

II.

We have jurisdiction to review the District Court's determination under 28 U.S.C. § 1291. Our review of a grant of summary judgment is plenary and "we must grant all

---

[3] The District Court accepted the City's verification that it possessed no recordings or notes from the meeting allegedly conducted at HOC on the morning of Wilson's suicide and further found that all non-privileged records had been produced, excepting the mental health record—which had been withheld on privacy grounds—of another HOC inmate who committed suicide. Abran was given fourteen days to present a good faith basis for why this record should be produced, but she took no further action to obtain it.

6

reasonable inferences from the evidence to the non-moving party." *See Knabe v. Boury Corp.*, 114 F.3d 407, 410 n. 4 (3d Cir. 1997); *see also Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 246–47 (3d Cir. 2002). We will affirm the grant of summary judgment only if no reasonable jury could find in Appellant's favor.

III.

The District Court's grant of summary judgment was proper, as Appellant's claims all fail on the merits and there was no abuse of discretion regarding discovery. Although Wilson's suicide was tragic, the District Court rightly concluded that none of the Defendants are liable.

First, we address the Eighth Amendment[4] claims against the high-ranking PDP supervisors: Warden May, Warden Giannetta, Warden Lawton, and Commissioner Carney. Appellant cannot show that any of these individuals are liable as they were not personally involved in the events leading up to Wilson's suicide. *See McKenna v. City of Phila.*, 582 F.3d 447, 460 (3d Cir. 2009) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). Indeed, Appellant now "concede[s]" that May and Giannetta had no direct involvement in this matter. Appellant's Br. at 34. As for Carney, Appellant implausibly argues that her receipt of certain reports *after* Wilson's suicide somehow creates liability—a contention with no basis in law. *See Ashcroft v. Iqbal*, 556 U.S. 662,

---

[4] Appellant's Fourth Amended Complaint inexplicably casts these claims as arising solely under the Fourth and Fourteenth Amendments. The District Court liberally construed the allegations as raising Eighth Amendment claims, which is plainly the pertinent legal framework for a prisoner like Wilson. *See Palakovic v. Wetzel*, 854 F.3d 209, 223 (3d Cir. 2017).

7

677 (2009); *Pineda v. Hamilton County*, 977 F.3d 483, 496 (6th Cir. 2020) (concluding that "after-the-fact approval" of an investigation as a basis for § 1983 liability would impermissibly amount to *respondeat superior*). Similarly, Appellant's contention that Lawton is liable because he implemented the policy requiring psychological testing prior to any HOC transfer—a policy Appellant says was flouted here—is belied by the record and irrelevant.[5] *See* Appx. 369–74 (Wilson received psychological exam from Dr. Oluwabusi before his transfer to HOC, as required by PDP placement policy).

Further, although Deputy Warden Talmadge did have personal involvement in handling Wilson's complaints, she is not liable for his suicide because she was not deliberately indifferent to his medical needs. *See Spruill v. Gillis*, 372 F.3d 218, 235–36 (3d Cir. 2004) (deliberate indifference to serious prisoner medical needs is required to state an Eighth Amendment claim); *Palakovic v. Wetzel*, 854 F.3d 209, 223 (3d Cir. 2017) (deliberate indifference means "something beyond mere negligence" to a prisoner's "particular vulnerability"). As the District Court found, Talmadge reasonably relied on the professional judgment of her medical personnel; she knew that Wilson's transfer to HOC would only go through upon successful completion of medical and behavioral health checks. As Talmadge had no reason to doubt these checks would occur and be properly conducted, her decision to transfer Wilson to HOC was not deliberately indifferent to his medical needs. *See Spruill*, 373 F.3d at 236 ("[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not

---

[5] Nor could holding a debriefing meeting *after* the suicide somehow demonstrate that Lawton was deliberately indifferent to Wilson's medical needs.

treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."); *see also Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019) ("We have long recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment."); *Snell v. Neville*, 998 F.3d 474, 498 (1st Cir. 2021) (similar).[6]

Similarly, the claims against non-supervisor Defendants Fearon and Cook based on conduct after Wilson was discovered on the floor of his cell also fail for lack of deliberate indifference. As the District Court observed, the record is "undisputed" that Fearon immediately reported Wilson's condition to medical staff and both Fearon and Cook repeatedly attempted life-saving measures on Wilson. *See Woloszyn v. County of Lawrence*, 396 F.3d 314, 324 (3d Cir. 2005) (finding no deliberate indifference where CPR was initiated immediately). Even if Fearon was apparently late by one minute on his rotation schedule patrolling past Wilson's cell, this would be "mere negligence" at worst, far from meeting the demanding standard of deliberate indifference. *See Palakovic*, 854 F.3d at 222; *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993). Fearon had no reason to believe that Wilson was a suicide-risk. Indeed, he had good cause to trust Wilson was *not* suicidal, knowing that medical personnel had declared as much in

---

[6] Talmadge's transfer decision was also reasonable in light of other considerations, principal among them that it ensured Wilson would be separated from the inmates he feared and he would receive increased supervision.

9

approving the HOC transfer.  There was thus no reason apparent to Fearon for giving Wilson any special supervision.

Appellant also contends that Nurse Orgasan "knew of and disregarded Gene Wilson's serious medical needs and . . . provide[d] inadequate, substandard and non-emergency medical care . . . ."  Appellant's Br. at 32–33.  To the contrary, the District Court correctly concluded that "no reasonable jury could find that her behavior constituted deliberate indifference to Wilson's medical needs," given that she immediately reported to his cell—arriving within three minutes of the emergency call—and attempted "numerous life-saving measures."  Appx. 17–18.  Further, Appellant is incorrect that Nurse Orgasan's testimony regarding the temperature of Wilson's body creates a genuine dispute of material fact sufficient to defeat summary judgment.  Although Fearon testified that Wilson's body was still warm when CPR began, any discrepancy here is not material; the undisputed record reflects that Orgasan, Fearon, and Cook all provided rapid life-saving care to Wilson in the minutes after discovering him.  Appellant has no evidence indicating that care was inadequate, let alone so inadequate as to create a constitutional violation.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.").

In sum, Gene Wilson's suicide was not the result of any constitutional tort.  As the District Court correctly determined that there was no underlying violation of Wilson's

10

rights, we need not proceed to analyze the liability of the City or Corizon under *Monell*.

*See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978); *Mulholland v. Gov't Cnty. of Berks*, 706 F.3d 227, 238 n. 15 (3d Cir. 2013) (internal citations omitted) ("It is well-settled that, if there is no [constitutional] violation in the first place, there can be no derivative municipal claim."); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003) (applying *Monell* liability framework to municipal contractor).

Finally, the District Court properly granted judgment on Appellant's state law claims against the City and its employees.[7] The record provides no basis for a showing of willful misconduct, which is necessary to evade the immunity from negligence liability contained in the Political Subdivision Tort Claims Act, 42 Pa.C.S. § 8541, *et seq*. Likewise, we agree with the District Court that there is no evidence in the record of a civil conspiracy existing before or after Wilson's suicide. Deprived of any viable substantive cause of action, Appellant's derivative wrongful death and survival act claims cannot survive independently. Accordingly, the state law claims all fail.

IV.

Apart from the merits, Appellant has strenuously argued—indeed, as the lead point in her opening brief—that summary judgment was improper because the District Court "fail[ed] to address" several of her discovery requests. Appellant's Br. at 19.

---

[7] Judgment against Appellant on the negligence claims against Corizon and Nurse Orgasan was entered earlier in the action for Appellant's failure to file a certificate of merit. *See* PA. R. CIV. P. 1042.3(a). She apparently does not challenge that determination in this appeal.

Specifically, Appellant contends that the City and Corizon possess records relating to Wilson's suicide and past HOC suicides to which she is entitled but which the Appellees have willfully withheld. The District Court purportedly ignored this by granting summary judgment while "fail[ing] to address the [outstanding discovery requests] in its own [summary judgment] memorandum and order." *Id*. In making this argument, we believe that Appellant has been less than candid with the Court. In effect, she tries to mislead us regarding the District Court's management of discovery in the case below.

Appellant fails to note that the District Court, prior to granting summary judgment, issued two written orders *denying the referenced discovery requests*. *See* Dist. Ct. Doc. Nos. 97, 121. Moreover, and directly contrary to Appellant's assertions in her brief, the District Court *again* addressed the discovery disputes *in its summary judgment opinion*, concluding that "there are no remaining discovery disputes and resolution of the present motions is appropriate." Appx. 9 n.9. Appellant only compounds her mischaracterization by clearly copying and pasting portions of argument made to the District Court on this issue into her appellate brief, not even bothering to edit the language. *See* Appellant's Br. at 17 ("As such the defendants' motion [for summary judgment] should be denied, or at a minimum stayed . . . ."). We remind Appellant's counsel of his duty of candor towards this tribunal and the consequences that can stem from failure to fulfill that duty. *See* Pa. R.P.C. 3.3(a)(1).

Reviewing the District Court's management of discovery, we detect no abuse of discretion. *See Country Floors, Inc. v. P'ship Composed of Gepner & Ford*, 930 F.2d 1056, 1062 (3d Cir. 1991).

## V.

We accordingly will affirm the order of the District Court.